UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
AUSCAPE INTERNATIONAL, et al.,

                              Plaintiffs,


               -against-                                    02 Civ. 6441 (LAK)


NATIONAL GEOGRAPHIC SOCIETY, et al.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**OPINION**


Appearances:

        Surjit P. Soni
        THE SONI LAW FIRM
        *Attorneys for Plaintiffs*

        Robert G. Sugarman
        Pierre M. Davis
        Denise Alvarez
        WEIL, GOTSHAL & MANGES LLP
        *Attorneys for Defendants National Geographic Society, National*
        *Geographic Holdings, Inc., National Geographic Ventures,*
        *National Geographic Interactive, National Geographic*
        *Enterprises, Inc., Image Collection and Image Sales, and*
        *Mindscape, Inc.*

        Terrence B. Adamson
        NATIONAL GEOGRAPHIC SOCIETY
        *Attorney for Defendants National Geographic Society, National*
        *Geographic Holdings, and National Geographic Enterprises, Inc.*

        Juli Wilson Marshall
        Daniel Scott Schecter
        Elizabeth Heering Hickey
        LATHAM & WATKINS LLP
        *Attorney for Defendants ProQuest Company and ProQuest*
        *Information and Learning Company*

Lewis A. Kaplan, *District Judge.*

Freelance photographers and writers who created images or wrote text that appeared in the *National Geographic Magazine* (the "*Magazine*") bring this action against the National Geographic Society ("NGS") and a number of its licensees, including ProQuest Information and Learning Company and ProQuest Company (collectively, the "ProQuest Defendants"). Plaintiffs claim that reproduction of their works as parts of CD-ROM collections of images of past issues of the *Magazine* violates their rights under the Copyright Act of 1976,[1] the Lanham Act,[2] and state statutory and common law.

In *Auscape International v. National Geographic Society* ("*Auscape I*")[3] this Court granted summary judgment dismissing plaintiffs' copyright infringement claims, to the extent they were based upon the electronic and microform reproductions of plaintiffs' works,[4] and their Lanham Act claims. The Court denied dispositive motions by both sides with respect to plaintiffs' state law claims without prejudice to renewal following appellate review of the copyright issue in a parallel case, *Faulkner v. National Geographic Society* ("*Faulkner II*").[5] The Second Circuit subsequently affirmed *Faulkner II*'s holding that defendants' CD-ROM archives of digital images of the *Magazine,* known as *The Complete National Geographic* (the "CNG"), were "revisions" of the print

---

[1]    17 U.S.C. § 101 *et seq.*

[2]    15 U.S.C. § 1125

[3]    409 F. Supp. 2d 235 (S.D.N.Y 2004).

[4]    The complaint alleges also that defendants infringed copyright by publishing reprints from the microform editions. However, neither side has fully identified, let alone addressed, whatever issues these matters present, so they are not discussed here.

[5]    294 F. Supp. 2d 523 (S.D.N.Y. 2003).

2

publications within the meaning of Section 201(c) of the Copyright Act of 1976[6] and therefore did not infringe any copyrights held by freelance photographers and writers whose works first were published, with their consent, in the *Magazine*.[7]

The parties now renew their motions for summary judgment as to the state law claims.[8] Plaintiffs assert three state law claims against NGS alone: (1) breach of contract, (2) breach of fiduciary duty, and (3) conversion. They assert six state law claims against all defendants: (1) unfair competition, (2) unfair trade practices in violation of California Business and Professions Code § 17200, (3) unjust enrichment, (4) involuntary trust pursuant to California Civil Code §2224, (5) commercial misappropriation in violation of the common law right of privacy, and (6) violation of the right of publicity under California Civil Code §§ 3344 and 3344.1.

*Facts*

Much of the background is set forth in *Auscape I* and *Faulkner II*, familiarity with which is assumed. A few words are necessary, however, about the agreements NGS signed with plaintiffs.

---

[6]

17 U.S.C. § 201(c).

[7]

*See Faulkner v. National Geographic Enterprises Inc.*, 409 F.3d 26 (2d Cir. 2005) (affirming except with respect to seven photographs that allegedly were subject to express contractual provisions preserving electronic rights in the copyright owners).

[8]

The Court retained supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) for the sake of judicial economy because (1) the state law claims are intimately related to the federal claims, (2) the state law claims already had been briefed and argued, and (3) the Court and parties invested heavily in resolving them.

Twenty plaintiffs remain in this case,[9] some of whom licensed numerous works to NGS and signed numerous agreements. As a result, a plethora of contracts, not all of which contain the same relevant provisions, is at issue. Almost all the agreements, however, fall into two groups: stock photography and assignment agreements.

A.    *Stock Photography Agreements*

The form of contract that governs a particular work depends on how the work was submitted to NGS.

In many instances, photographers submitted preexisting photographs to NGS, which either returned the images or, if it chose to publish them, sent payment. To memorialize such a transaction, NGS wrote a letter acknowledging its purchase of "one-time reproduction rights"[10] to the purchased photographs. These letters are referred to as "stock photography agreements."

B.    *Assignment Agreements*

In other instances, NGS commissioned works for the *Magazine*. In such cases it signed contracts under which freelancers took photographs of (or wrote articles about) specified

---

[9]

The claims of plaintiffs Jake Page, Suzanne Page, and Peter Turner were dismissed because those plaintiffs voluntarily withdrew from the case. *See* Order dated November 4, 2002 (Docket Item 19) (citing Def. Consol. Mot. Sum. J. Ex. 5). In view of the letter from plaintiffs, dated November 7, 2002, *see* Def. Consol. Mot. Sum. J. Ex. 6 (letter from plaintiffs' counsel) (stating that "Mr. Rogers has decided to withdraw his claims"), this action, insofar as it is brought on behalf of Art Rogers, is dismissed as well.

[10]

*See, e.g.*, Def. Consol. Mot. Sum. J. Ex. 27 (letter to plaintiff Morris).

4

subject matter.[11] The agreements stated that the works produced would be considered "as specially commissioned for use by NGS" and that all the rights, including copyright, were to be "deemed transferred exclusively and indefinitely to NGS."[12]  These contracts are referred to as "assignment agreements."

Under most of the assignment agreements, NGS collected all the photographs taken on a particular assignment and selected some for publication. Photographs not selected for publication were returned to the photographer and, with the rights in them, became his or her property.[13] Under others, NGS agreed to reconvey copyright in assignment photographs to the photographer, but retained the right to "reproduce any photographs from the assignments whether published or unpublished for NGS use or for NGS products."[14] Most of the assignment agreements reserved to NGS the right to use the licensed work for "further use," such as "promotional, advertising, or another editorial use," for which the photographer or writer would be paid additional compensation.[15]

---

[11]
     *See, e.g.*, *id.* Ex. 18B (letter to plaintiff Menzel). In some cases no specific subject matter was identified, but rather the photographer was hired to "do[] photographic work" for NGS. *See, e.g.*, *id.* Ex. 43 (letter to plaintiff Nebbia).

[12]
     *E.g.*, *id.* Ex. 18B (letter to plaintiff Menzel).

[13]
     *See, e.g.*, *id.*

[14]
     *See, e.g.*, *id.* Ex. 30 (letter to plaintiff Schofield).

[15]
     *E.g.*, *id.* Ex. 18I (letter to plaintiff Schofield) ("[I]f NGS makes further use (promotional, advertising, another editorial use) of a retained photograph, it will make additional payment."); *id.* Exs. 17, 18A, 18E-H, 18N (letters to plaintiffs Nebbia, Maisel, Schofield, Woolfitt) ("You hereby grant the Society the right to use any of the assignmented photographs for promotional or advertising purposes. We will make additional payment for

5

C.      *The Schofield Agreement*

A few agreements are not easily categorized.

One is that between NGS and plaintiff Phil Schofield, dated October 20, 1999 (the "October 1999 Agreement"), pertaining to photographs by Schofield that appeared in the May 2000 *Magazine* (the "May 2000 Works").[16] That contract contains a clause permitting NGS to use Schofield's "name and likeness" in connection with the publication of the commissioned works.[17] It makes no mention of "further use" but distinguishes between "primary use," for which Schofield would not be compensated further, and "secondary use," for which he would. Primary use under the agreement is limited mainly to original publication in the *Magazine* and other uses made within ninety days thereof. Secondary use is defined to include use in "anthologies or other collections and compilations of NGM [the *Magazine*] or any form in which NGM . . . may be recast, transformed or adapted, in any medium known or hereinafter developed, discovered or created, including but not limited to any form of electronic media."[18] Despite the distinctions between primary and secondary use, however, the contract includes the following clause:

---

such use or for a new editorial use."); *id.* Exs. 18B-D, 18J, 18L-M (letters to plaintiffs Menzel, Schofield, Swanson, Woolfitt) ("[I]f NGS makes further use (promotional, advertising, another editorial use) of a photograph selected for publication, it will make additional appropriate payment to you.").

16

*See id.* Ex. 20.

17

*Id.* ¶ 10(i) ("You grant to NGS without additional charge the right to use your name, likeness and biographical material in connection with the publication of any Photographs produced under this Agreement.").

18

*Id.* ¶¶ 4, 5 & n.2.

> "Nothing herein shall be deemed to limit or impair NGS' copyright in any issue of NGM . . . as a collected work in which the Photographs produced under this Agreement appear, and NGS shall have the right to reprint and republish such issue of NGM . . . without further compensation, in any medium now known or hereinafter developed, discovered or created, either singly or in an indexed anthology or in any other type of compilation of issue(s) of NGM."[19]

The contract provides also that NGS shall not, without Schofield's consent, license the rights in the May 2000 Works to third parties for use in a product that is not made by "NGS, a corporate subsidiary, or licensee of NGS . . . which carries an NGS trademark and over which NGS has final . . . right to review, formulate standards for, or to exercise a veto over the appearance, text, Use or promotion."[20] Finally, the contract states that "[t]he original transparencies of all published Photographs will remain at NGS, and NGS will return to you the original transparencies of unpublished photographs."[21]

## Discussion

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[22] Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence

---

[19] *Id.* ¶ 10(k).

[20] *Id.* ¶ 10(a).

[21] *Id.* ¶ 10(b).

[22] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000); *see also* Fed. R. Civ. P. 56(c).

to go to the trier of fact on an essential element of the nonmovant's claim.[23]   In that event, the

nonmoving party must come forward with admissible evidence[24] sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment.[25]

A court faced with cross-motions for summary judgment need not "grant judgment

as a matter of law for one side or the other," but "must evaluate each party's motion on its own

merits, taking care in each instance to draw all reasonable inferences against the party whose motion

is under consideration."[26]

A.      Preemption

Count III of the complaint is a claim for unfair competition. It alleges that defendants

are liable for false designation of origin in that defendants' placement of copyright notice on the

---

23

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin At. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

24

*See, e.g.*, *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001); *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997).

25

*E.g.*, *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (holding that when the nonmoving party bears the burden of proof at trial, the moving party is entitled to summary judgment if the nonmovant fails to make a showing on an essential element of its claim); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citing *Celotex*, 477 U.S. at 322-23).

26

*E.g.*, *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (quoting *Schwabenbauer v. Bd. of Ed.*, 667 F.2d 305, 313-14 (2d Cir. 1981) (internal citations omitted)).

8

CNG was an effort to "palm off" plaintiffs' works as their own.[27] Count VII alleges unjust

enrichment on the theory that defendants were enriched solely by their infringement of plaintiffs'

copyrights.[28]

These claims are identical to claims made in the *Faulkner* case. This Court there held

that such claims are preempted by Section 301 of the Copyright Act because they ultimately reduce

to claims of copyright infringement.[29] Plaintiffs' claims, therefore, are preempted as well.

B.    *Statutes of Limitations*

Defendants argue that statutes of limitations have run as to all claims save those

pertaining to the May 2000 Works.[30] The first question is which statutes of limitations apply.

---

[27]

Cpt. ¶ 549.

[28]

*See* Cpt. ¶ 538.

[29]

*See Faulkner I*, 211 F. Supp. 2d at 477-78.

[30]

The May 2000 Works are governed by a contract signed in 1999 and did not appear in the CNG until 2001. As discussed below, the shortest statutory period for any of plaintiffs' claims is one year (for the right to privacy claim). Plaintiff Schofield's claims arising from the May 2000 Works, therefore, all are timely and must be evaluated on the merits.

Schofield has produced three additional agreements dated after January 31, 1998. *See* Pl. Mot. Ptl. Sum. J. Ex. 60. Several claims relating to these agreements would be timely. The complaint, however, makes no reference to these agreements or to works governed by them. It alleges only that Schofield's works appeared in the May 2000 *Magazine* and in pre-1994 issues. Cpt. ¶¶ 395-400; *see also* Pl. Mot. Ptl. Sum. J. Ex 19 (Schofield Decl.). Schofield's only timely claims, therefore, are those pertaining to the May 2000 Works.

9

1.    *Choice of Law*

A federal court adjudicating state law claims ordinarily applies the substantive law of the forum state.[31] If a case is transferred pursuant to 28 U.S.C. § 1404(a),[32] however, the law of the transferor court applies.[33] This action was filed in the Central District of California[34] before being transferred to this Court pursuant to Section 1404(a). Accordingly, this Court applies California law.

California applies the governmental interest approach to conflict of law issues.[35] Choice of law depends on "an analysis of the respective interests of the states involved."[36] Where the conflict concerns a statute of limitations, the governmental interest approach generally leads California courts to apply California law.[37] "An action will not be maintained if it is barred by the

---

[31]
     *See, e.g.*, *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir.1989).

[32]
     28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.").

[33]
     *See Ferens v. John Deere Co.*, 494 U.S. 516 (1990) (holding that the substantive law of the transferor court applies when the plaintiff initiates transfer); *Van Dusen v. Barrack*, 376 U.S. 612 (1964) (holding that the substantive law of the transferor court applies when the defendant initiates transfer); *Menowitz v. Brown*  991 F.2d 36, 40 (2d Cir. 1993) ("a transferee court applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed.").

[34]
     *See* Cpt. ¶ 12 (alleging proper venue in the Central District of California).

[35]
     *E.g.*, *Hurtado v. Superior Court*, 11 Cal. 3d 574, 579-80, 114 Cal. Rptr. 106, 522 P.2d 666 (1974).

[36]
     *Id.* at 579, 114 Cal. Rptr. at 109, 522 P.2d at 669.

[37]
     *See, e.g.*, *Peterson v. Kennedy*, 771 F.2d 1244, 1251 n.4 (9th Cir. 1985); *American Bank of Commerce v. Corondoni*, 169 Cal. App. 3d 368, 215 Cal. Rptr. 331 (2d Dist. 1985).

statute of limitations of the forum"[38] because a "state has a substantial interest in preventing the prosecution in its courts of claims which it deems to be 'stale.'"[39] This led the Ninth Circuit to conclude, subject to rare exceptions not relevant here, that California courts will dismiss a claim that is barred by California's statute of limitations.[40] In consequence, if any of plaintiffs' claims would be untimely in California, they must be dismissed as untimely.

       2.     *California Statutes of Limitations*

       a.     *Contract Claims*

Under California law, the limitations period begins to run at the moment the cause of action accrues.[41] A cause of action accrues "when the cause of action is complete with all of its elements."[42] In an action for breach of contract, this ordinarily occurs at the time of breach, and the statute begins to run at that time regardless of whether any damage is apparent or whether the injured party is aware of his right to sue.[43]

---

38

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 142(a).

39

*Id.* § 142, cmt f.

40

*Deutsch v. Turner Corp.*, 324 F.3d 692, 716-717 (9th Cir. 2003).

41

*See* Cal. Civ. Proc. Code § 312 ("Civil actions, without exception, can only be commenced within the periods prescribed in this title, after the cause of action shall have accrued, unless where, in special cases, a different limitation is prescribed by statute.").

42

*Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397, 981 P.2d 79, 88 (1999).

43

3 WITKIN CALIFORNIA PROCEDURE § 486 (4th ed. 1997) (citing *Niles v. Louis H. Rapoport & Sons*, 53 Cal. App. 2d 644, 651, 128 P.2d 50, 54 (2d Dist. 1942) ("The statute commences as of the date of breach of the obligation.")).

The contract claims, which are asserted only against the NGS defendants, are governed by a four-year statute of limitations.[44] As plaintiffs filed their complaint on January 31, 2002, the claims are untimely unless the agreements were breached after January 31, 1998.

The contract claims appear to rest on two different theories.  First, plaintiffs allege that the publication of the CNG exceeded the scope of the licensing agreements. In particular, they contend that such publication constituted "further use" of their works warranting additional compensation under the assignment agreements, and that it exceeded the scope of the "one-time reproduction rights" granted under the stock photography agreements.[45] Second, plaintiffs allege that the licensing agreements prohibited NGS from transferring the rights in their works to third parties, and so were breached when NGS authorized the other defendants to create the CNG.

### (1)    Electronic Use

NGS first published the CNG in 1997. Under plaintiffs' first theory, this is when NGS breached the agreements and so when the contract claims accrued.

Plaintiffs nevertheless contend that their claims are timely. First, they claim that the statute of limitations was tolled until they discovered the existence of the CNG, which was shortly

---

[44]

See Cal. Civ. Proc. Code § 337 (providing a four-year limitation period for "[a]n action upon any contract, obligation or liability founded upon an instrument in writing.").

[45]

Though plaintiffs do not specifically raise the issue in their papers, they presumably intend their theory of contract breach to cover the agreements with plaintiff Oxford Scientific Films (Oxford), regarding works that were published in 1994 issues of the Magazine. These agreements are variations on the stock photography agreements, but contain additional provisions. In particular, they provide that NGS shall not engage in "any electronic or digital use, storage or transmission of any Pictures" without Oxford's consent. See Cpt. Exs. 4-11-1, 4-11-2.

12

before filing the complaint. Second, they argue that each annual publication of the CNG amounted to a new breach of contract and that a new limitations period started with the release of each edition.

The discovery argument is unavailing. Under California law, "[i]n ordinary tort and contract actions . . . [t]he plaintiff's ignorance of the cause of action, or of the identity of the wrongdoer, does not toll the statute."[46] The discovery rule only applies in cases where (a) the cause of action is governed by a statute expressly providing for the rule,  (b) the relationship between the parties is one of special trust, such as when the defendant is a fiduciary, or (c) the plaintiff "is unable to see or appreciate a breach has occurred," such as in cases "involving underground trespass, negligently manufactured drugs, products liability, violations of the right of privacy, latent defects in real property, or breaches of contract committed in secret."[47]

This is an ordinary contract action in every sense. No California statute provides for the discovery rule in actions by authors against publishers. Nor are publishers fiduciaries or in any special relationship of trust with authors.[48] Finally, this is not a case where injury was hidden. To the contrary, the CNG was marketed vigorously and the fact that the *Magazine* was available in

---

46

    *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal. 3d 176, 187, 491 P.2d 421, 428, 98 Cal. Rptr. 837, 844 (1971) (finding no discovery rule in the context of legal malpractice), *superceded on other grounds by* Cal. Civ. Proc. Code § 340.6 (providing for discovery rule in legal malpractice actions).

47

    *See Moreno v. Sanchez*, 106 Cal. App. 4th 1415, 1423, 131 Cal. Rptr. 2d 684, 689 (2d Dist. 2003) (citing statutes and cases).

48

    *See Ekern v. Sew/Fit Co., Inc.*, 622 F. Supp. 367, 373 (N.D. Ill. 1985) (noting that the "relationship between a publisher and an author is not generally regarded as one between fiduciaries"); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*, 33 A.D.2d 766, 306 N.Y.S.2d 599, 601 (1st Dep't 1969) (finding no fiduciary relationship between an author and a publisher because), *aff'd by* 30 N.Y.2d 34, 281 N.E.2d 142, 330 N.Y.S.2d 329 (1972); *see also infra*, discussion of plaintiff Schofield's breach of fiduciary duty claim.

13

electronic format was widely announced. The discovery rule plainly does not apply.

The claim that each annual edition of the CNG constituted a new breach also is unavailing. The works published in an earlier CD-ROM appear in exactly the same way in exactly the same context in later CD-ROMs. That is, the use of a works in CD-ROM 109 is not a "further use" beyond that made in CD-ROM 108. Nor is it a new electronic use or an additional "reproduction" of the work. To the extent it breached the agreements in releasing CD-ROM 108, and it is not clear that it did,[49] NGS committed no new breach in releasing CD-ROM 109, and so the limitations period did not begin anew.

### (2)   Unauthorized Transfer

The claims based on the unauthorized transfer are untimely as well. These claims

---

[49]
This Court already has addressed the issue of whether the CNG amounts to "further use" under the assignment agreements. In *Faulkner III v. National Geographic Society*, --- F. Supp. 2d ---, 2006 WL 2666308 (S.D.N.Y., Sept. 18, 2006) ("*Faulkner III*"), the Court held that "further use" is an ambiguous term that could mean any new use beyond hard copy publication in the *Magazine* or only use outside the context of the *Magazine*. Evidence of the parties' subsequent conduct, however, revealed that they adopted the latter meaning. NGS consistently paid the plaintiffs for use of their works outside the context of the *Magazine*, such as in slide shows and video presentations, but never for use of their works in the context of the *Magazine*. The Court thus found no breach and granted summary judgment dismissing the contract claims. *See id* at **4-7.

In this case, the contracts and the evidence are the same. Plaintiffs have produced no evidence showing that they intended the CNG to be considered "further use" and, if they did, that they communicated this to NGS. The record, however, is replete with evidence that NGS paid plaintiffs when it reproduced their works outside, but not when it reproduced them within, the context of the *Magazine*. *See* Pl. Mot. Ptl. Sum. J. Ex. 63 (letters to Peter Menzel) (offering payment for use of "lightning" photograph, commissioned under an assignment agreement with a "further use" clause, *see* Def Consol. Mot. Sum. J. Ex. 18D, in videos and foreign language publications). The evidence is the same with respect to works governed by stock photography agreements. *See, e.g.*, *id.* Ex. 49 (letters to Loren McIntrye) (offering payment for using a previously published works in a filmstrips and foreign language publications).

14

accrued when NGS authorized, without plaintiffs' consent, the creation and marketing of the CNG products by the other defendants. As the Court found in *Auscape I*, NGS's contracts with the ProQuest Defendants ended in 1993.[50] Further, NGS licensed its rights to the other defendants in 1996.[51] Any claims based on the unauthorized transfer of rights thus accrued, at the latest, in 1996, six years before the complaint was filed.

        b.     *Tort Claims*

The relevant California statutes of limitations for the tort claims are as follows. The claims sounding in unfair trade practices and breach of fiduciary duty are governed by four-year statutes of limitations.[52] The conversion claims (asserted against the NGS defendants only) are governed by a three-year statute.[53] The claims of involuntary trust, to the extent they seek remedies

---

[50]

      409 F. Supp. 2d at 241 & n.28.

[51]

      *See* Fahey Decl. Exs. J, K (contracts with Mindscape).

[52]

      Claims of unfair trade practices under CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 are governed by Section 17208 of the same title, which provides that "[a]ny action to enforce any cause of action pursuant to this chapter shall be commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this section shall be revived by its enactment." The claims of breach of fiduciary duty are not covered by specific statutes, and so fall under the catchall statute, CALIFORNIA CODE OF CIVIL PROCEDURE § 343, which provides for a four-year limitations period for all claims not specifically covered by another statute.

[53]

      CAL. CIV. PROC. CODE § 338(c).

15

for fraud, also are governed by a three-year statute.[54] And the claims based on the rights to privacy and publicity are governed by a one-year statute and a two-year statute, respectively.[55] In sum, the longest statutory period applicable to any of plaintiffs' tort claims is four years. Any claims that accrued before January 31, 1998, are therefore untimely.

---

[54]

CAL. CIV. PROC. CODE § 338(d) (providing a three-year limitations period for fraud actions); *see In re Advent Mgmt. Corp.*, 178 B.R. 480, 489 (9th Cir. 1995) ("Because it is a remedy, the right to a constructive trust is subject to the statute of limitations on the underlying action that gives rise to the right to a constructive trust.") (citing *Davies v. Krasna*, 14 Cal. 3d 502, 516, 121 Cal. Rptr. 705, 535 P.2d 1161, 1170 (1975)).

[55]

A right of privacy claim is considered by the California courts to be a personal injury claim, whereas a right of publicity claim is considered to be a claim of intrusion on a property interest. *See Macchi v. Jackson*, 2002 WL 265887, *2 (Cal. App. 2d Dist., Feb. 26, 2002) (unpublished). California's statute of limitations for personal injury claims is currently codified in CALIFORNIA CODE OF CIVIL PROCEDURE § 335.1, and provides for a two-year limitations period. However, at the time plaintiffs filed their complaint in January 31, 2002, the personal injury statute of limitations was § 340(3), which provided for a one-year period. The extension granted by the newly codified § 335.1 was made retroactive only to personal injury or wrongful death actions brought by victims of the September 11, 2001, terrorist attacks. *See Osijo v. Home Ins. Co.*, 2004 WL 1966027, *9 (Cal. App. 5th Dist., Sep. 7, 2004) (unpublished)  (citing SEN. BILL NO. 688 (2001-2002 Reg. Sess.) § 1). The privacy claim is thus governed by the one-year period of the former § 340(3). The publicity claim is governed by § 339(1), which provides a two-year limitations period. *See Macchi*, 2002 WL 265887 at *2 ("Regardless of whether misappropriation of name is viewed as a violation of the right to privacy so that the one-year statute of limitations of Code of Civil Procedure section 340, subdivision (3) applies or as an intrusion upon a property interest in the right of publicity so that the two-year statute of limitations of Code of Civil Procedure section 339, subdivision (1) applies, a cause of action for misappropriation of name is time barred because Macchi filed his complaint more than two years after he discovered the alleged misuse of his name.); *see also Barton v. New United Motor Mfg, Inc.*, 43 Cal. App. 4th 1200, 1206, 51 Cal. Rptr. 2d 328, 331 (1st Dist. 1996) (noting that the personal injury statute, § 340(3) (now § 335.1), governs personal rights, while § 339(1) governs property rights).

The claims against the ProQuest Defendants arise from the inclusion of plaintiffs' works in the GPO databases. As the Court found in *Auscape I*, such actions ended as early as 1996.[56] Hence, plaintiffs' claims against the ProQuest Defendants are untimely.

The timeliness issue for plaintiffs' tort claims against the NGS defendants is less straightforward. These claims are based on the publication of the CNG, which would suggest that they accrued in 1997 when the CNG first was published. Plaintiffs argue, however, that their claims are timely because each annual publication of the CNG started a new limitations periods.

Defendants argue that such reliance on the continuing wrong doctrine is erroneous in this context because California has enacted the Uniform Single Publication Act ("USPA"), which provides that

> "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions."[57]

All of plaintiffs non-contract claims fall within the statute, which speaks specifically to right of privacy claims and broadly to causes of action for *any other tort*. The relevant question, then, is whether the claims are "founded upon a[] single publication" within the meaning of the USPA or whether they are founded upon numerous publications, that is, each annual publication of the CNG.

---

[56]    409 F. Supp. 2d at 242 & nn.30-31.

[57]    CAL. CIV. PROC. CODE § 3425.3.

The California courts have given some guidance on this question. In *Kanarek v. Bugliosi*,[58] a California appellate court held that the paperback republication of a book updating a hardcover publication was a "new" publication and therefore gave rise to a new libel claim. It held that since the paperback edition of a book "was undoubtedly intended to and did reach a new group of readers . . . [t]he filing of a new action for damages based on libel is not barred by the Uniform Single Publication Act."[59]

*Kanarek* was premised on the assumption that paperback versions of books are published to reach audiences that are unwilling to pay the higher prices of hardcover editions. The case thus stands for the proposition that a plaintiff may avoid the USPA if the defendant's second publication was designed to be different enough from the first in either form or price to reach a new sector of the market.

Plaintiffs have produced no evidence suggesting that later editions of the CNG are less expensive or in a different format than earlier versions, or evidence of an intent to reach a new sector of the market. Instead, the evidence shows that the contents of CD-ROM 108 (the earliest publication of the CNG) are wholly included in the contents of CD-ROM 109 (the first publication of the CNG that would be actionable under the applicable statutes of limitations[60]). The works published in an earlier CD-ROM appear in exactly the same way in exactly the same context as they do in later ones. The only difference between versions of the CNG is that each successive annual

---

[58]

108 Cal. App. 3d 327, 166 Cal. Rptr. 526 (2d Dist. 1980).

[59]

*Id.* at 333, 166 Cal. Rptr. at 530.

[60]

*See* Def. Consol. Rule 56.1 St. ¶ 43 (stating that CD-ROM 109 was published in 1998).

18

version includes more content, namely, another year's worth of issues of the *Magazine*. Thus, instead of being aimed at a new audience, the later CNG editions are aimed at the same audience— those who seek the most up-to-date archive of the *Magazine*. A later edition is not new publication. It is the same publication with an addendum.

More on point is *Belli v. Roberts Bros. Furs*,[61] in which a California appellate court held that different editions of the same issue of a newspaper must be considered a single publication under the USPA. The court noted that the legislative history of California Civil Code § 3425.3, which incorporates the USPA, demonstrated that the statute was originally drafted with reference to a single "edition" of a newspaper or magazine, but was changed to apply to a single "issue" of a newspaper or magazine.[62] This change of language was crucial, the court held, because "issue" is a broader term than "edition," as multiple editions of a newspaper may comprise a single issue.[63] In other words, when a publication is modified to include more up-to-date information, rather than marketed with a substantially different form or price so as to reach a new sector of the market, the modification is not a new publication. No new limitations period is triggered.

*Belli* suggests that if a freelancer's photograph appeared in CD-ROM 108, its reappearance in CD-ROM 109 or any subsequent version of the CNG was not a new publication of the work. The later CD-ROMs simply included additional material, much like later editions of a

---

[61]

240 Cal. App. 2d 284, 49 Cal. Rptr. 625 (1st Dist. 1966).

[62]

*Id.* at 287, 49 Cal. Rptr. at 627-28.

[63]

*Id.* at 289, 49 Cal. Rptr. at 629-30 ("The various editions of the Chronicle for February 14, 1962 comprise a single integrated publication, namely the issue of the newspaper for that date.").

newspaper contain the same information as earlier editions in the same issue.[64] The CNG is an "issue" of a larger digital archive, and each year's update a new "edition" within that issue.

Defendants' successive publications of the CNG are thus a "single publication" under the USPA. The statutes of limitations for plaintiffs' tort claims began to run in 1997. They did not restart with each subsequent edition of the CNG, and so plaintiffs' claims sounding in tort are time barred.[65]

## C.     *The May 2000 Works*

### 1.     *Contract Claims*

Schofield alleges that NGS breached the October 1999 Agreement by making electronic use of those photographs in excess of the scope of the agreement and by authorizing its subsidiaries to reproduce the *Magazine* in electronic media.

---

[64]

Plaintiffs argue that the decade sets are new publications because they are designed to reach new audiences: "why would a purchaser of the initial [CD-ROM 108] buy, for example, a decade set already included in [CD-ROM 108]?" Pl. Br. Opp'n Def. Consol. Mot. Sum. J. 60. This argument misses the point. While the decade sets may be priced lower than the complete sets or targeted at a different audience, the fact remains that the decade sets are subsets of the same digital archive. Each decade set comprises part of a complete set, much like each complete set comprises part of the entire archive. They are "sub-editions" of a single "issue" of the archive, and so part of the same publication.

[65]

Plaintiffs contend that the limitations periods were tolled until they discovered the CNG, which was shortly before filing the complaint. This argument is without merit. The California courts have held that the discovery rule does not apply when the single publication rule does. *See, e.g.*, *Shively v. Bozanich*, 31 Cal. 4th 1230, 80 P.3d 676 (2003) (holding that the discovery rules does not apply to libel claims where offending statements are published in books because otherwise it would "undermine the single-publication rule and reinstate the indefinite tolling of the statute of limitations intended to be cured by the adoption of the single-publication rule").

### a.   Electronic Reproduction

Schofield's contract provides for additional payment for "secondary use" of the May 2000 Works, which includes electronic use in "NGS products" and derivatives thereof. An NGS product is "a product of NGS [or a] corporate subsidiary . . . which carries an NGS trademark and over which NGS has final . . . right to review, formulate standards for, or to exercise veto power over the appearance, text, Use or promotion of the product."[66]  The CNG is clearly an NGS product: it bears the NGS logo, and no party other than NGS and its subsidiaries is alleged to have editorial control over it. In all respects it is a product that NGS planned, designed, controlled, and marketed.

While the CNG is an NGS product, it is not one for which Schofield was entitled to additional compensation. The agreement clearly states that NGS retains full copyright ownership of the *Magazine* as a collective work and full rights to reprint the May 2000 *Magazine* in any format, including digital media, without further compensation. NGS's reproduction of the May 2000 Works therefore was completely within its contractual rights.

### b.   Unauthorized Transfer

The parties do not dispute that NGS authorized its subsidiaries to reproduce the *Magazine* in electronic media.[67] Schofield claims, however, that the October 1999 Agreement did

---

[66]

  *Id.* ¶ 10(a).

[67]

  NGS's license to the ProQuest defendants to reproduce the *Magazine* in microform media is not relevant to Schofield's claims relating to the May 2000 Works because NGS's relationship with the ProQuest defendants ended in 1993.

not permit NGS to do so.

As the Court noted in *Faulkner II*, copyright in a collective work is distinct from copyright in each contribution.[68] Moreover, Section 201(d)(1) of the Copyright Act provides that "[t]he ownership of copyright may be transferred in whole or in part by any means of conveyance."[69] Thus, one who owns copyright in a compilation may grant to others the right to reproduce and distribute that compilation.

As NGS owns the copyright to the *Magazine* as a collective work, by the plain terms of Section 201(d)(1), it is presumed to be permitted to assign its rights to third parties. The burden is on Schofield to show that this right was curtailed.

This is a burden that Schofield does not meet. No clause of the October 1999 Agreement limits NGS's ability to transfer its rights in the *Magazine*. The Agreement prohibits unauthorized transfer of rights for use in *non-NGS* products.[70] As noted, however, the CNG is an NGS product. Moreover, the contract states that NGS will retain full rights in the *Magazine*, and that "[n]*othing* herein shall be deemed to limit or impair NGS' copyright in any issue of NGM . . . as a collected work."[71]

---

[68]

    *Faulkner II*, 294 F. Supp. 2d at 529-30 (citing 17 U.S.C. § 201(c)).

[69]

    17 U.S.C. § 201(d)(1). In addition, Section 106 allows a copyright owner to authorize others to reproduce and distribute a work. *See id.* at § 106 ("Subject to sections 107 through 122, the owner of a copyright under this title has the exclusive rights to do *and to authorize* any of the following: [enumerating exclusive rights].") (emphasis added).

[70]

    *See* Def. Consol. Mot. Sum. J. Ex. 20 ¶ 10(e)

[71]

    Def. Consol. Mot. Sum. J. Ex. 20 ¶ 10(k) (emphasis added).

2.      *Tort Claims*

a.      *Breach of Fiduciary Duty*

Schofield argues that NGS, as the publisher of a collective work, owed a fiduciary duty to the contributors to ensure that proper credit was given for each contribution, and to prevent the unauthorized copying of the contributions.[72] Count XII alleges that NGS breached this duty when it distributed the CNG, which allows users to make unauthorized copies of individual images outside of the context of the *Magazine*.

The elements of a breach of fiduciary duty claim in California are (1) the existence of a fiduciary relationship, (2) its breach, and (3) damage proximately caused by that breach.[73] While California courts have been reluctant to give a precise definition of a fiduciary relationship, one principle is clear: parties to arm's length transactions do not, without more, owe each other fiduciary obligations; they are obliged to perform under the contract, but failure to discharge such an obligation gives rise to contractual liability, not liability for breach of fiduciary duty.[74] It therefore

---

[72]    *See* Pl. Br. Opp'n Def. Consol. Mot. Sum. J. 56. Plaintiffs also appear to argue that NGS owed plaintiffs the obligation to renew copyright in their works. *See id.*; Cpt. ¶¶ 627-632. Because only the May 2000 Works, which were created after January 1978, are at issue here, renewal of copyright is not relevant. *See* 17 U.S.C. § 302.

[73]    *E.g.*, *Mendoza v. Rast Produce Co., Inc.*, 140 Cal. App. 4th 1395, 1405, 45 Cal. Rptr.3d 525, 533 (5th Dist. 2006).

[74]    *See e.g.*, *Recorded Picture Co. v. Nelson Entm't, Inc.*, 53 Cal. App. 4th 350, 370-371, 61 Cal. Rptr. 2d 742, 754 (2d Dist. 1997) ("the typical distribution contract, negotiated at arm's length, does not create a fiduciary relationship between the owner of a product and the distributor. The distribution contract is an elaborate one which undertakes to define the respective rights and duties of the parties. A mere contract or a debt does not constitute a trust or create a fiduciary relationship.") (internal citations, quotations, and alterations

is generally held that the relationship between author and publisher is not a fiduciary relationship, but rather a commercial relationship between contracting parties. Publishers are not duty bound to act always in the interest of their author clients. They are bound only by the terms of the contracts they sign.[75]

In this case, there is no evidence indicating that NGS assumed a fiduciary role. Schofield sold his services in the marketplace and NGS bought them. Schofield and NGS were parties to an arm's length transaction and were bound only by the terms of the October 1999 Agreement. To the extent Schofield may have wanted a publisher to prevent the copying of the May 2000 Works, he could have bargained for such protection with NGS or chosen to sell his services to another publisher.

    b.    *Conversion*

Count XIV of the complaint alleges that NGS has converted plaintiffs' photographic

---

omitted); *Mitsui Mfgs. Bank v. Superior Court*, 212 Cal. App.3d 726, 260 Cal. Rptr. 793 (4th Dist. 1989) (finding no fiduciary liability where transaction between bank and borrowers and guarantors involved quintessentially ordinary arms-length commercial transaction between two parties of equal bargaining strength, any breach of which could adequately be remedied by ordinary contract damages).

[75] *See Ekern v. Sew/Fit Co., Inc.*, 622 F. Supp. 367, 373 (N.D. Ill. 1985) (noting that the "relationship between a publisher and an author is not generally regarded as one between fiduciaries" and finding no tort liability where a publisher promoted a book directly in competition with the author-plaintiff's because the parties' relationship was governed by contract); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*, 33 A.D.2d 766, 306 N.Y.S.2d 599, 601 (1st Dep't 1969) (no fiduciary relationship exists between an author and a publisher because "this was a purely commercial relationship and a purely commercial transaction. The action more properly may be considered an action for breach of contract with demonstrated failure by defendants to use their 'best efforts,' as they agreed to do under the publishing contract, for the continued promotion and sale of plaintiff's books"), *aff'd by* 30 N.Y.2d 34, 281 N.E.2d 142, 330 N.Y.S.2d 329 (1972).

transparencies and negatives by failing to return them after initially using them for purposes of publishing the *Magazine*.

Under California law, the elements of conversion are (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages.[76] Generally, a plaintiff must demand the return of the converted property, and defendant must refuse to comply, before a conversion claim can be stated. The only exceptions are when the property was acquired wrongfully in the first place, or when demand would be futile because, for example, it has already been sold or destroyed.[77]

Under the terms of the October 1999 Agreement, NGS was permitted to make use of all transparencies for the May 2000 Works, and was entitled to keep the transparencies of the published photographs. NGS therefore is the rightful owner of the published transparencies and so cannot be liable for converting them.[78]

---

[76]

E.g., *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1066, 80 Cal. Rptr. 2d 704, 706 (1st Dist. 1998).

[77]

E.g., *Flennaugh v. Heinrich*, 89 Cal. App. 2d 214, 221, 200 P.2d 580, 585 (3d Dist. 1948) ("While it is true that when property comes into the possession of a bailee or other person tortiously or unlawfully, or when demand for possession thereof by the owner would be futile, a demand, as a necessary prerequisite to the maintenance of a suit for conversion, is not necessary. But when the defendant lawfully acquires possession of property with consent of the owner, demand for its possession is necessary to create a liability for conversion or unlawful withholding of the property.").

[78]

Schofield argues that NGS is not the lawful owner because its right to keep the published transparencies was conditioned on its compliance with the other terms of the contract. *See* Pl. Opp'n Def. Consol. Rule 56.1 St. ¶ 106 ("when NGS failed to make the additional required payments, these subclauses were rescinded and all rights transferred thereunder, including those related to retention of images, reverted back to the Plaintiffs."). This argument is unavailing. Schofield is, in effect, demanding restitution as a remedy for contract breach. He cannot do so, however, because his claims of contract breach fail for the reasons stated above.

Nor is NGS liable for converting the transparencies of any unpublished photographs. While NGS was required to return the transparencies for all unpublished works, there is no evidence that NGS still remains in possession of them. Moreover, Schofield's claim would fail even if there were. Since NGS was entitled to possess the transparencies for the purpose of selecting which of them to publish, and since there is no evidence that the transparencies have been lost, sold, or destroyed (or that demand would otherwise be futile), Schofield was required to produce evidence showing that he demanded the return of the transparencies and that NGS refused to comply. This he has not done.[79]

c.      *Unfair Trade Practices*

Count II of the complaint alleges unfair trade practices in violation of California's Business and Professions Code Section 17200. That statute, in relevant part, prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

Taking advantage of Section 17200's broad "any unlawful act" language, the complaint alleges numerous predicate acts in support of this claim.[80] It alleges (1) contract breach and failure to compensate plaintiffs for the use of their works, (2) misleading use of plaintiffs'

---

[79]
Plaintiffs argue that the filing of the complaint itself constitutes the required demand for the return of the transparencies. *See* Pl. Br. Opp'n Def. Consol. Mot. Sum. J. 58. This is nonsense. It is axiomatic that the elements of a claim must be pleaded in the complaint; the complaint itself therefore cannot constitute an element of a cause of action. In any event, plaintiffs have not produced any evidence that defendants have refused to return any withheld transparencies in light of the complaint.

[80]
*See* Cpt. ¶ 544. Plaintiffs list nine allegations from (i) to (viii), repeating numeral (vii). However, allegations (i) and (ii) are both allegations of contract breach.

names, (3) false designation of origin, (4) false claim of copyright ownership, (5) false advertising, (6) copyright infringement, and (7) violations of the federal Racketeer Influenced and Corrupt Organization Act of 1970 ("RICO").[81]

None of these allegations can support an unfair trade practices claim. First, Schofield's claims of contract breach fail for the reasons stated above.[82] Second, the claims based on false use of names, false designation of origin, false claims of copyright ownership, and false advertising are simply restatements of the Lanham Act claims that were dismissed in *Auscape I*.[83] Third, an unfair trade practices claim predicated on "wanton and repeated acts of copyright infringement" is preempted by Section 301(c) of the Copyright Act.[84] And finally, plaintiffs have dropped their RICO claim.[85]

---

[81]

    18. U.S.C. § 1961 *et seq*.

[82]

    To the extent the unfair trade practices cause of action is asserted against the other defendants besides NGS, it cannot be based on a breach of contract. No evidence suggests that Schofield ever had a contractual relationship with the other defendants.

[83]

    *Auscape I*, 409 F. Supp. 2d at 249-52 (granting defendants' motion for summary judgment as to Lanham Act claims based on false use of plaintiffs' names, false designation of origin, and false claims of copyright ownership).

[84]

    17 U.S.C. § 301.

[85]

    The complaint states that plaintiffs "believe" they have a cause of action under the RICO statute, and proceed to allege facts in order to "preserve the right to assert claims thereunder once sufficient discovery has taken place to confirm Plaintiffs' beliefs in this regard." Cpt. ¶¶ 518, 519-532. However, plaintiffs did not file an amended complaint properly asserting any RICO cause of action, and in their memorandum of law in opposition to the present motion, plaintiffs unequivocally state that "they have not and are not asserting any RICO causes of action." Pl. Br. Opp'n Def. Consol. Mot. Sum. J. 56.

### d.    *Involuntary Trust*

Count VIII of the complaint, which seeks to impose an involuntary trust NGS's profits from the CNG, fails for the same reason.

The imposition of an involuntary trust under California law requires (1) the existence of property or some interest in property, (2) the right of the complaining party to that property, and (3) some wrongful acquisition or detention of that property by another party who is not entitled to it.[86]

Plaintiffs assert that the "wrongful acquisition" in this case was defendants' false advertising, misrepresentation, unfair trade practices, misappropriation of plaintiffs' good will, names or likenesses, contract breaches, and copyright infringement.[87] The claim for involuntary trust therefore is predicated on claims that already have been dismissed or are preempted. Accordingly, it is dismissed as well.

### e.    *Rights of Privacy and Publicity*

Finally, Counts IV and V of the complaint allege violations of the common law right of privacy and the right of publicity under California Civil Code Section 3344. These claims are the

---

[86]

   *E.g.*, *Communist Party v. 522 Valencia, Inc*, 35 Cal. App. 4th 980, 990, 41 Cal. Rptr. 2d 618, 623-24 (1st Dist. 1995)*.*

[87]

   *See* Pl. Br. Opp'n Def. Consol. Mot. Sum. J. 51.

28

same for present purposes.[88] Each requires (1) the defendant's use of the plaintiff's identity, (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise, (3) lack of consent, and (4) resulting injury.[89]

Schofield claims that defendants "used" his name, without his consent, "for the purposes of advertising or selling" the CNG.[90] That is, because his name already was attached to the May 2000 Works in the original *Magazine* in order to give him credit for his contributions, his name necessarily was copied when the *Magazine* was copied and then "used" in the marketing of the CNG.

The October 1999 Agreement clearly provides that Schofield "grant[ed] to NGS without additional charge the right to use [his] name, likeness and biographical material in connection with the publication of any Photographs produced under this Agreement."[91]

---

[88]

> The common law right of privacy comes in four forms, the relevant one being "appropriation, for the defendant's advantage, of the plaintiff's name or likeness." *E.g.*, *Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 819, 603 P.2d 425, 429 (1979) (enumerating the four right to privacy causes of action in California). According to the California courts, Sections 3344 and 3344.1, which create the right to publicity, embody this common law right to privacy. Though they are not a strict codification of the common law, they complement it, *e.g.*, *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) (noting that the elements for a cause of action under the common law and Sections 3344-3344.1 are the same, because the statutes merely added remedies and did not alter the common law), and provide remedies for a defendant's knowing "use [of] the name, voice, signature, photograph, or likeness" of another person (alive or deceased), without his or her consent, in the marketing, sale, or advertisement of a product, CAL. CIV. CODE §§ 3344, 3344.1.

[89]

> *E.g.*, *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 40 Cal. Rptr. 2d 639 (6th Dist. 1995).

[90]

> Cpt. ¶¶ 564-565.

[91]

> Def. Consol. Mot. Sum. J. Ex. 20 ¶ 10(i). Schofield argues that NGS is not entitled by contract to use his name because it breached the October 1999 Agreement. *See* Pl. Br. Opp'n Def. Consol. Mot. Sum. J. 57 ("In contracts which discuss permission to use name

He nonetheless argues that this consent was limited to use of his name in connection with the print version of the *Magazine*. In other words, Schofield interprets the term "the publication" to refer to a specific publication as opposed to the general act of publishing. This reading, however, does not comport with the plain meaning of the contract's terms.

Under California law, when interpreting a contract, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.[92] When the "name and likeness" clause is read in conjunction with the other parts of the agreement, it is clear Schofield's interpretation cannot stand.

First, the agreement contemplates many possible publications, specifically apportioning rights for print and electronic publications and publications outside the context of the *Magazine*. In this context, the "name and likeness" clause must be read to refer to all uses specifically enumerated in the agreement. It cannot be read arbitrarily to apply to one kind of publication and not another.

Moreover, the Agreement provides that "*nothing* herein" shall limit NGS's rights to reproduce the *Magazine*, "and NGS shall have the right to reprint and republish" the *Magazine* in

---

or likeness, clauses which contain these terms fall under the conditional 'subject to' provisions, rescinded upon NGS' failure to make further payment which was a failure of consideration and failure to comply with an essential condition of the contracts."). This argument is unavailing because NGS did not breach the October 1999 Agreement. It retained its contractual right to use Schofield's name in connection with his works.

[92]

Cal. Civ. Code § 1641; *see Am Alternative Ins. Corp. v. Superior Court*, 135 Cal. App. 4th 1239, 1245, 37 Cal. Rptr. 3d 918, 922 (2d Dist. 2006) ("We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation.").

30

electronic form.[93] Schofield's reading of the "name and likeness" clause would contravene this language and render it essentially inoperative. To adopt it would prevent NGS from reproducing the May 2000 *Magazine*, which bears Schofield's name.

The October 1999 Agreement, therefore, expressly permitted NGS to use Schofield's name in connection with the CNG.

*Conclusion*

For the foregoing reasons defendants' motions for summary judgment dismissing the state law claims are granted. Plaintiffs' motion for partial summary judgment is denied.

SO ORDERED.

Dated:  November 7, 2006

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[93]     Def. Consol. Mot. Sum. J. Ex. 20 ¶ 10(k) (emphasis added).